UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TARA SULLIVAN,

      Petitioner,

v.

ANTHONY STEWART,

      Respondent.

Case No. 2:17-cv-11371
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING PETITION FOR HABEAS CORPUS AND
GRANTING CERTIFICATE OF APPEALABILITY ON ONE CLAIM**

---

In August 2012, Terrence McKelney was shot twice in his arm. The State of Michigan charged Tara Sullivan, two of her three sons, and a friend of one of her sons. A jury convicted Tara[1] of assault with intent to murder and a judge sentenced her to a minimum of 12 years in prison for that conviction. Tara appealed to no avail. She now comes to federal court, seeking a writ of habeas corpus. The Court has carefully reviewed her six grounds for the writ and concludes that none entitle her to relief.

**I.**

**A.**

At Tara's trial, McKelney described how he was shot. He stated that on August 1, 2012, at about 4:30 p.m., he had gone to a store located on Grand River Avenue in Detroit. (PageID.603.)[2] McKelney recalled buying cigarettes, leaving the store, and heading down a nearby alley. (PageID.604–605.) At that point, he saw Tara and one of her sons, Cortez Sullivan, walking toward

---

[1] Because multiple people involved have the last name "Sullivan," the Court will refer to the individual Sullivans by their first names.

[2] Unless indicated otherwise, all citations are to the Rule 5 materials found at ECF No. 10.

him in the alley. (PageID.605.) McKelney said that Tara then pulled a gun from her purse and stated, "I'm getting your money today." (PageID.606.) McKelney recalled Cortez pulling out a gun, too. (PageID.607.) McKelney and Tara then got into an argument; while they argued, McKelney sensed someone come up from behind him. (PageID.608–610.) He testified: "When I . . . got that feeling, I struck off and start running and the person struck off with me and start running behind me, shooting." (PageID.610.) According to McKelney, the person chasing him was another of Tara's sons, Eric Sullivan. (PageID.610.) Two bullets hit McKelney, one in his upper arm and one in his thumb. (PageID.612.) McKelney said that after he was able to distance himself a bit from the Sullivans, he saw "four, five people" shooting. (PageID.614.) McKelney said one of the people shooting was Tara.

The jury also heard from Allen Williams, a police officer who witnessed some of the incident. On the day of the shooting, Williams was off duty and driving down Grand River. (PageID.796, 836.) He told the jury that when he was at a traffic light, he heard "[a] lot of gunshots coming from right to my left." (PageID.796.) It looked to Williams like there was a gentleman "running for his life down the alley, and another gentleman behind him." (PageID.797.) Williams continued describing the scene: "There's a female running right kind of tandem with him, just offset to his right just a little bit. But also appeared to be, to my observation, chasing the individual who was running." (PageID.799.) Williams testified that, eventually, four individuals ran toward a nearby house. (PageID.803–804.) Williams recalled that as he drove toward the house, he heard one of the four individuals say, "I think I shot him four times in the back," with Tara responding, "that motherfucker dead." (PageID.807.) Williams recalled that the four individuals got into a gray Escort and drove off; Tara was the driver. (PageID.805–806.) On cross examination, Williams acknowledged that he never saw Tara fire a gun. (PageID.836.)

2

Marcus Ball, the officer in charge of the police investigation, interviewed Tara the day after the shooting. (PageID.1036.) At trial, Ball read back his written account of the interview. During the interview, Tara explained,

> Me and my 16-year-old son Cortez was walking to the store to get a cigarette. We walked down the alley. We saw the guy who had made threats to cut my throat and had thrown a big brick through my front window. My other son [Eric Sullivan] was coming down the street. . . . When I saw the guy, I got so scared. He turned around and walked back to me and said, ["Y]ou're lucky your son is here or I would kick your ass.["]

(PageID.1037.) Tara told Ball that she did not see Eric chasing McKelney down the alley but instead saw Eric standing in the alley, keeping an eye on her as she walked home. (PageID.1040.) Ball continued to quote Tara: "I don't know if my son had a gun or not, but if he did have a gun and shot someone, it was only because he was trying to protect me." (PageID.1040.) According to Tara, after Eric arrived home, she and Cortez grabbed their laundry bags. (PageID.1040.) As they were leaving the house, Tara saw her third son, Deontay Sullivan, and his friend, Diontai Manier, coming down the street. (PageID.1040.) The five of them—Tara, Eric, Cortez, Deontay, and Manier—got into the car and drove off. (PageID.1040–1041.) Ball continued to read his transcription of the interview to the jury:

> [Ball:] What happened next?
>
> [Tara:] I was driving on the freeway. I was coming up on the Boulevard exit when I saw the police behind us. . . . They told us to show them our hands. The next thing I heard them talking about guns and that they had found guns in the car. It got bad and I thought that we were going to prison for the rest of our lives.
>
> [Ball:] Why did you think that you were going to prison?
>
> [Tara:] Because I heard about all those guns and about four guns that they found in the car.

(PageID.1041.)

Based on the testimony of McKelney, Williams, and Ball, Tara's interview with Ball, and other evidence, the jury convicted Tara of assault with intent to murder. (PageID.1501.) Tara was also convicted of carrying a concealed weapon. (PageID.1501.) Although tried with Tara, Eric Sullivan, Deontay Sullivan, and Diontai Manier had a second, separate jury decide their fate. Their jury convicted Eric of assault with intent to murder (and several other charges) but found Deontay and Mainer not guilty of all charges. (PageID.1483–1490.) Cortez Sullivan was not charged or tried. (PageID.1202.)

The judge sentenced Tara to 12 to 20 years in prison on the assault with intent to murder conviction and one to five years in prison on the conviction for carrying a concealed weapon. (PageID.1541.) The sentences were concurrent. (*Id.*)

## B.

Tara appealed. The Michigan Court of Appeals rejected all of Tara's grounds for appeal. *See generally People v. Sullivan*, No. 315843, 2014 WL 5462663 (Mich. Ct. App. Oct. 28, 2014).

And, except for one claim, the Michigan Supreme Court denied leave to appeal. *People v. Sullivan*, 877 N.W.2d 722, 722 (Mich. 2016). In addressing Tara's claim that the judge, rather than the jury, found facts that increased her sentence, the Michigan Supreme Court remanded the case to the trial court to apply the "sentencing procedure described in *People v. Lockridge*." *See Sullivan*, 877 N.W.2d at 722 (citing 870 N.W.2d 502 (Mich. 2015)). Otherwise, the Michigan Supreme Court denied leave to appeal. *Id.*

In September 2017, and while this federal case was pending, Tara was resentenced to a term of 8 1/2 to 20 years on the assault with intent to murder conviction. (PageID.72.)

Tara now petitions this Court for a writ of habeas corpus. (ECF No. 1.)

## II.

The Antiterrorism and Effective Death Penalty Act (AEDPA) (and 28 U.S.C. § 2254 in particular) "confirm[s] that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). If a claim was "adjudicated on the merits in State court proceedings," this Court cannot grant habeas corpus relief on the basis of that claim "unless the adjudication of the claim . . . resulted in a decision" (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d). But if the state courts did not adjudicate a claim "on the merits," this "'AEDPA deference' does not apply and [this Court] will review the claim de novo." *Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014).

## III.

The analysis that follows has six parts corresponding to the six grounds for relief in Tara's petition for a writ of habeas corpus. (*See* ECF No. 1, PageID.14–28.)

### A.

In Ground I of her petition, Tara argues that she was deprived of her constitutional right of compulsory process and her constitutional right to present a defense when the prosecutor engaged in witness intimidation. (ECF No. 1, PageID.16; ECF No. 12, PageID.1950.)

To appreciate this claim, some additional background is necessary.

After the prosecution rested, Tara indicated that she wanted to call her then-17-year-old son, Cortez Sullivan, to testify. Cortez had not been charged with McKelney's shooting. After Tara indicated that she would call Cortez, Cortez's court-appointed counsel gave the following

explanation to the court: "Based upon what [Cortez] told me I didn't see anything that would per [se] incriminate himself. . . . What I understand is, is that his testimony would be exculpatory towards another one of the defendants. . . . But he is going to put himself at the scene." (PageID.1201.) A moment later, the prosecutor stated—in Cortez's presence—"*I am going to say on the record if I put him at that scene I'm going to charge him.* . . . I can't tell you for sure, but I can tell you so it's fair and open and everyone understands that he can be re-charged." (PageID.1202 (emphasis added).) Cortez's counsel then stated, "Judge, that changes things because obviously he would have to put himself at the scene to say I saw what did or did not happen[.]" (PageID.1203.) The court and Cortez's counsel then conducted voir dire of Cortez; Cortez indicated that he still wanted to testify. (PageID.1212–1213.)

But following additional consultation with his counsel, Cortez changed his mind. (PageID.1215, 1240–1241.) Cortez's counsel explained that initially he had not advised Cortez against testifying because he anticipated Cortez's testimony to be "I was at the scene, I didn't do anything, my mother didn't do anything." (PageID.1240.) But, counsel explained, "I didn't have the benefit of knowing when I first talked to my client that just admitting that he was at the scene could . . . result in him being charged." (PageID.1241.) Thus, Cortez's counsel explained, "I had to impress upon him that . . . he has to look out for himself here." (PageID.1241–1242.) Tara's counsel expressed that he was "deeply concerned about [Tara's] 6th Amendment Right." (PageID.1229.)

The next day, there was additional discussion about the proper remedy for the prosecutor's statement. Ultimately, the prosecutor offered Cortez a formal agreement granting him both use and transactional immunity if he testified truthfully. (PageID.1260–1261, 1264–1265.) "'Transactional immunity is a complete bar to prosecution for the offense to which the grant of immunity relates.'"

*People v. Pettiford*, No. 288551, 2010 WL 1814150, at *3 (Mich. Ct. App. May 6, 2010) (quoting *People v. Schmidt*, 455 N.W.2d 430, 435 (Mich. Ct. App. 1990)). Given the imprecise statements by counsel and the court about transactional immunity, the concept may not have been clearly conveyed to Cortez. (*See* PageID.1258–1270.) But the trial judge thought that use and transactional immunity "restore[d] Cortez Sullivan's free and voluntary choice to testify." (PageID.1265.) After Cortez and his counsel had further discussion about immunity, Cortez's counsel reported the following to the court: "[H]e's still concerned about what [the prosecutor] said yesterday. I said that's out the window. This agreement that we decide nullifies everything [the prosecutor] said. I explained it to him about five times. You know either he doesn't get it or he doesn't want to get it." (PageID.1269.) Tara's counsel sought a mistrial (PageID.1251–1252, 1254, 1271–1272); the motion was denied (PageID.1266). In the end, Cortez never did testify, and Tara put on no witnesses. (*See* PageID.1283–1284.)

With that background, Ground I of Tara's petition can be readily understood. In her view, Cortez, her only witness, planned to testify until the prosecutor indicated that she would charge him if his testimony put him at the scene of the shooting. (*See* ECF No. 1, PageID.14–15.) And while the prosecution later offered immunity to Cortez, in Tara's view, that did not eliminate the effect of the statement. According to Tara, even if Cortez did testify, the prosecutor's threat might have caused him to testify differently. (ECF No. 1, PageID.15.) And, in any event, Cortez did not testify. So, according to Tara, the prosecutor violated her constitutional rights to compulsory process and to present a complete defense. (ECF No. 1, PageID.16; ECF No. 12, PageID.1949–1950.)

The Michigan Court of Appeals addressed this claim. The appellate court acknowledged that a "prosecutor's successful efforts to intimidate witnesses from testifying would deny a

defendant's constitutional right[s]" and that "a remark by the prosecutor that a witness may face criminal charges that is overheard by the witness may be intimidating." *Sullivan*, 2014 WL 5462663, at *2. But, according to the Michigan Court of Appeals, "the question remains whether the prosecutor substantially interfered with the witness's free and unhampered choice to testify" and if "substantial interference is established, the inquiry shifts to whether the defendant was prejudiced." *Id.* The state appellate court found that the trial court "did not clearly err in finding that the transactional and use immunity granted to Cortez was sufficient to dispel the prosecutor's unintentional intimidation of Cortez." *Id.* at *4. Because the offer of immunity was "sufficient to dispel any possible prejudice caused by the prosecutor's allegedly intimidating remark," the Michigan Court of Appeals concluded that Tara was "not deprived of due process." *Id.*

That was an "on the merits" adjudication as that phrase is used in § 2254(d). That means that Tara must show that the Michigan Court of Appeals' decision was (1) "contrary to, or involved an unreasonable application of," Supreme Court precedent or (2) "based on an unreasonable determination of the facts." See 28 U.S.C. § 2254(d).

Tara cannot clear § 2254(d).

The Court begins with the applicable Supreme Court precedent. A criminal defendant has the constitutional right to present witnesses to establish her defense. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). In *Webb v. Texas*, the Supreme Court found a violation of this constitutional right. There, the judge told the defendant's only witness, "If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood (sic) is that you would get convicted of perjury." 409 U.S. 95, 96 (1972). The witness decided not to testify. The Supreme Court found that "the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to

preclude him from making a free and voluntary choice whether or not to testify." *Id.* at 98. Thus, the defendant, deprived of his only witness, was denied due process.

In *United States v. Thomas*, 488 F.2d 334 (6th Cir. 1973), the Sixth Circuit held that *Webb* extended to a prosecutor's intimidation of a witness. There, a secret service agent, acting at the behest of the federal prosecutor, told a defense witness that the witness "would be prosecuted for misprision of a felony if he testified." *Id.* at 335. The defense witness decided not to testify. *Id.* The government argued that "its later statement to the District Court that [the witness] would not be prosecuted based on his testimony was sufficient to overcome any prejudice inuring to the appellant." *Id.* at 336. The Sixth Circuit found that the government's mere "statement that it would forego prosecution" did not "wipe out the prejudicial effect of the event." *Id.* In the Sixth Circuit's view, the prosecution would need to go further: "Nothing short of complete immunity, if even that, could have relieved [the witness'] apprehension, and restored his free and voluntary choice, eliminating the prejudice." *Id.*

The Michigan Court of Appeals did not unreasonably apply the Supreme Court's holdings in *Washington* or *Webb*—even as applied by the Sixth Circuit in *Thomas*. First, the state appellate court got the test correct. Although the Michigan Court of Appeals used the term "prejudice," it apparently concluded that the prosecutor's offer of use and transactional immunity served to nullify the prosecutor's earlier threat. In particular, the Michigan Court of Appeals stated that the offer of immunity was sufficient to "dispel" the intimidation. *Sullivan*, 2014 WL 5462663, at *4. This is consistent with the test in *Webb*: whether "the unnecessarily strong terms used by the [prosecutor] could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify," 409 U.S. at 98—effectively, the

Michigan Court of Appeals found that the offer of immunity restored Cortez's free and voluntary choice.

Second, the Michigan Court of Appeals reasonably applied the test. True, the record suggests that despite the offer of transactional immunity, Cortez did not testify because he— subjectively—remained concerned about being charged. (*See* PageID.1269.) But it was not unreasonable for the Michigan Court of Appeals to find that the offer of transactional immunity negated the prosecutor's threat such that—objectively—the threat no longer "exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice." *Webb* did not address the issue of whether, in the mind of a reasonable witness, the prosecution's offer of complete immunity would negate its earlier threat to charge the witness. And in *Thomas*, the Sixth Circuit left open the possibility that the prosecutor could cure the threat by offering complete immunity: "*Nothing short of complete immunity*, if even that, could have relieved [the witness'] apprehension, and restored his free and voluntary choice, eliminating the prejudice." 488 F.2d at 336 (emphasis added); *see also United States v. Emuegbunam*, 268 F.3d 377, 401 (6th Cir. 2001) (stating that the Sixth Circuit had not decided whether witness immunity can cure the prosecution's distortion of the fact-finding process). Thus, the Michigan Court of Appeals did not unreasonably apply *Webb* to hold that the offer of complete immunity was sufficient, objectively speaking, to restore a witness' free and voluntary choice to testify even if, in Cortez's mind, it did not.

In short, § 2254(d) bars habeas corpus relief on Ground I.

## B.

Tara also claims that she is entitled to a writ because the trial court incorrectly instructed the jury. (*See* ECF No. 1, PageID.22 (Ground IV).)

10

More facts are also necessary to appreciate this claim. The prosecution had relied on an aiding-and-abetting theory (PageID.269, 271, 383, 1196), but had not charged Tara (or any of the defendants) with being an accessory after the fact (PageID.1369–1371, 1476). Still, at the request of all defense counsel (including Tara's) (PageID.1369–1370), the trial court gave the jury an instruction that distinguished between the two concepts (PageID.1434). Instruction 8.7 explained that (1) if Tara had, "*before or during*" an assault with intent to murder or an armed robbery, helped another commit those crimes, the jury "*may*" find her guilty of aiding or abetting; (2) if Tara knew about an assault with intent to murder or an armed robbery and helped the person who committed those crimes avoid discovery or arrest "*after* the crime ended," the jury "*may*" find her guilty of being an accessory after the fact; and (3) "[i]f the prosecutor has not proven either of th[o]se charges beyond a reasonable doubt," the jury "*must*" find her not guilty. (PageID.1434 (emphases added).)

Instruction 8.7 proved troublesome. Not only had none of the defendants been charged with accessory after the fact, the verdict form also did not permit the jury to convict Tara of accessory after the fact. (PageID.1465, 1497–1498.) During deliberations, Tara's jury sent a note to the judge: "In reference to [Instruction] 8.7, number one, how do we communicate to you that we believe she, the defendant, is guilty of being an Accessory After the Fact of the felony of Assault With the Intent to Murder?" (PageID.1496; *see also* PageID.1464–1465.) The judge responded to the jury, "The question or the issue you have addressed is not an option. Your options that you are to consider are listed on the verdict form." (PageID.1465.) The next day, another note came, again related to Instruction 8.7. The note read, "Does willful assistance equal intent yes or no, from [Instruction] 8.7?" (PageID.1479.) The judge responded to the jury, "I really believe that if you carefully read this instruction this answers your question, alright, and that you can fulfill your

11

responsibilities as jurors. However, I'm going to read it again out loud." (PageID.1479–1480.)
And the judge proceeded to read Instruction 8.7 aloud. (PageID.1480–1481.) Later that morning,
Tara's jury found her guilty of assault with intent to murder. (PageID.1501.)

That background gives context to this claim for a writ. Tara argues that the trial judge twice
erred. First, Tara says, "the trial court erred by . . . instructing the jury that they could find [her]
guilty of accessory after the fact." (ECF No. 12, PageID.1962.) Second, Tara argues, the trial judge
erred by not instructing the jury that "if they found [her] guilty of accessory after the fact, they
could not find her guilty as a principal (and vice versa)." (ECF No. 12, PageID.1962.)

As to Tara's first argument, the Michigan Court of Appeals found, "Because Tara requested
the instruction based on [Instruction] 8.7 and her counsel expressed satisfaction with the initial
jury instructions as given, Tara waived any challenge to the initial instructions." *Sullivan*, 2014
WL 5462663, at *6.

The Michigan Court of Appeals is correct that Instruction 8.7 was included in the jury
instructions because defense counsel, including Tara's counsel, asked for it to be included.
(PageID.1369–1370.) So, arguably, any claim for a writ of habeas corpus based on the initial
provision of Instruction 8.7 is procedurally defaulted.

But rather than venture down the procedural-default path, the Court elects to address on
the merits Tara's claim about including Instruction 8.7 in the jury instructions. *See, e.g.*,
*Richardson v. Palmer*, 941 F.3d 838, 847 (6th Cir. 2019) (skipping to the merits); *Bennett v.
Brewer*, 940 F.3d 279, 287 (6th Cir. 2019) (same).

On the merits, Tara cannot show that providing Instruction 8.7 deprived her of a
fundamentally fair trial. *See Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012) (providing that to
be a cognizable habeas claim, an erroneous jury instruction must deprive the defendant of due

process). To be sure, Tara was not charged with being an accessory after the fact, so Instruction 8.7 was somewhat misleading. In fact, the jury's notes reflect their confusion. But Instruction 8.7 was not wholly without purpose. Defense counsel wanted the instruction because it described the distinction between aiding and abetting and accessory after the fact, and thus had the potential of helping the jury better understand aiding and abetting (which, again, was the prosecution's theory). (PageID.1369.) Further, much of the confusion over Instruction 8.7 was dispelled when the trial court clarified for the jury that accessory after the fact was not an option and that their only options were on the verdict form. (PageID.1465.) Given that Instruction 8.7 arguably helped the jury better understand aiding and abetting, and that the confusion caused by giving that instruction was lessened by instructing the jury to follow the verdict form, this Court cannot say that providing Instruction 8.7 deprived Tara of a fundamentally fair trial.

As for Tara's second argument—that the trial court failed to instruct the jury that if it found her guilty of being accessory after the fact, it could not find her guilty under an aiding-and-abetting theory—the Michigan Court of Appeals addressed that claim through the lens of plain-error review. Citing *People v. Hartford*, 406 N.W.2d 276, 278 (Mich. Ct. App. 1987), the Michigan Court of Appeals noted that a person could help "both before and after crime," and, in that scenario, it would be proper to convict the "person as a principal under an aiding and abetting theory." *Sullivan*, 2014 WL 5462663, at *7. The Michigan Court of Appeals explained that although the jury indicated in its note that Tara was guilty of being accessory after the fact, the jury did not indicate "that it believed that Tara was guilty *only* of accessory after the fact." *Id.* at *8. Thus, the court reasoned, "The jury might have concluded that Tara provided assistance both before, during, and after the crime, thus potentially resulting in a circumstance such as in *Hartford* . . . in which this Court found it appropriate to vacate a conviction for accessory after the fact because a person

cannot be convicted as both a principal and an accessory after the fact." *Id.* at *8. The Michigan Court of Appeals concluded, "Because the jury instructions fairly presented the issues to be tried and adequately protected Tara's rights, there was no plain error." *Id.*

Although the Michigan Court of Appeals provided that explanation under the umbrella of plain-error review, the Sixth Circuit has held that plain-error review is an "on the merits" adjudication as that term is used in § 2254(d). *Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017). And, in this case, the Michigan Court of Appeals' plain-error review was analogous to deciding whether Tara was deprived a fundamentally fair trial. *See Sullivan*, 2014 WL 5462663, at *6 ("Tara has the burden of establishing that plain error affected her substantial rights and that the error resulted in her wrongful conviction when she was actually innocent or seriously affected the fairness, integrity, or public reputation of judicial proceedings."). That means for this Court to grant Tara a writ, she must show that the Michigan Court of Appeals' decision was based on unreasonable factual finding or was contrary to, or an unreasonable application of, Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

Tara has not made that showing. Factually, the Michigan Court of Appeals reasonably found that the jury's note did not indicate that Tara was *only* guilty of being an accessory after the fact. True, the note did say that Tara "is guilty" of being accessory after the fact. But the jury did not take the further step of saying Tara was not also guilty of aiding-and-abetting. As the Michigan Court of Appeals reasoned, the jury may have thought that Tara helped after—and during—the crime.

What about the law? The Michigan Court of Appeals cited state law holding that "'[t]he appropriate way to view a defendant who has helped both before and after a crime is as a principal.'" *See Sullivan*, 2014 WL 5462663, at *7 (quoting *Hartford*, 406 N.W.2d at 279). Tara

14

wants the opposite rule—that when a defendant is found to have both helped before and after a crime, the defendant is merely an accessory after the fact. Yet she cites no Michigan case or statute supporting that rule.

Tara does cite *Bollenbach v. United States*, 326 U.S. 607 (1946) (ECF No. 12, PageID.1963), but that case is of no help to her. The judge in *Bollenbach* erroneously told the jury that if the defendant possessed property shortly after a theft, it could be presumed that the defendant was the thief—i.e., the judge told the jury to presume that the defendant was a principal if it found that the defendant possessed the goods shortly after the crime. *See id.* at 610–11. Tara's judge did no such thing—he did not suggest to the jurors that because they thought that Tara was guilty of being an accessory after the fact that they should presume she was an aider and abettor. He merely told the jury that their options were limited to those on the verdict form.

In hindsight, perhaps Tara should not have supported the request for Instruction 8.7 to be given to the jury. But, under de novo review, the provision of Instruction 8.7, even when coupled with the manner in which the trial court answered the jury's questions, did not deprive Tara of a fair trial. As for Tara's claim that the jurors needed to be instructed that if they found her to be an accessory after the fact, they could not find her to be an aider or abettor, that jury instruction would have been contrary to state law. *See Hartford*, 406 N.W.2d at 279. Tara is thus not entitled to a writ based on Ground IV.

## C.

Tara makes another claim for a writ of habeas corpus related to Instruction 8.7. (*See* ECF No. 1, PageID.25–27 (Ground V).) She argues that when the jury asked how to "communicate to you that we believe she, the defendant, is guilty of being an Accessory After the Fact of the felony of Assault With the Intent to Murder?" (PageID.1496), the trial judge should have accepted a

verdict of accessory after the fact (ECF No. 12, PageID.1965–1968). Tara argues that by not accepting the jury's finding, the judge unlawfully invaded the province of the jury. (ECF No. 12, PageID.1968.)

In her brief filed in the Michigan Court of Appeals, Tara made the argument that the trial court erred in not allowing the jury to convict her of accessory after the fact. (PageID.1659–1662.) But she did not argue that the trial judge invaded the province of the jury. Perhaps for that reason, the Michigan Court of Appeals did not (explicitly at least) treat the argument as one under the Federal Constitution.

But even assuming that Tara adequately presented a claim under the Constitution, and further assuming that the Michigan Court of Appeals did not treat her argument as one under the Constitution, Tara would still not be entitled to a writ based on this claim. The Michigan Court of Appeals found that the jury's note indicating that Tara "is guilty" of accessory after the fact did not exclude the possibility that the jury also thought Tara was guilty of aiding and abetting. *Sullivan*, 2014 WL 5462663, at *8. That factual finding is owed deference. *See* 28 U.S.C. §§ 2254(d)(2), 2254(e)(1). And in addition to that fact, two others are relevant: Tara was not charged with being an accessory after the fact and the verdict form did not permit that selection. Given those three facts—that the jury might have thought Tara was guilty of being both an accessory and an aider and abettor, that she was not charged with being an accessory, and the verdict form did not permit the jury to convict Tara of being an accessory—the judge's refusal to accept the jury's finding that Tara was an accessory after the fact did not violate Tara's constitutional right to have a jury decide her fate.

Tara cites two decisions in support of her claim, but both cases are quite unlike hers.

16

The Court's statement in *Gallick v. Baltimore & Ohio Railroad Co.* that "the [Ohio] Court of Appeals improperly invaded the function and province of the jury" was just another way of saying that "the record shows sufficient evidence to warrant the jury's conclusion that petitioner's injuries were caused by the acts or omissions of respondent." 372 U.S. 108, 113 (1963). In other words, the state appellate court in *Gallick* erred by finding that the evidence was not sufficient to support the jury's finding of causation; Tara's trial judge did not reject the accessory after the fact finding for lack of evidence—it was simply not a charge Tara faced.

*Wallace v. Havener*, 552 F.2d 721 (6th Cir. 1977), also does not help Tara. There, a jury had indicated that they had reached agreement on several counts but that they could not reach agreement on one count; so the court declared a mistrial. *Id.* at 723. The defendant was then re-tried and found guilty on all counts. *Id.* The Sixth Circuit held that it was a violation of the Double Jeopardy Clause for the defendant to be retried on those counts for which there was agreement in the first trial. *Id.* at 723–24. Here, Tara's claim is not based on the Double Jeopardy Clause. Moreover, *Wallace* did not address the situation where a jury had found a defendant guilty of a crime that the defendant had not been charged with committing.

Tara is not entitled to a writ based on Ground V.

### D.

Tara also complains that she was denied her constitutional right to testify. Here, too, some additional background is necessary.

After Cortez made his final decision to not testify, the question of whether the defendants would testify arose. Eric Sullivan and Diontai Manier waived their right to testify on the record. (PageID.1275, 1277.) Deontay Sullivan underwent voir dire on the record but, in the end, said he was "really not prepared to make the decision [whether to testify] right now." (PageID.1277–

1278.) As for Tara, she did not waive her right to testify on the record; she did not even undergo voir dire. The trial then shifted to Tara's case. She introduced some phone records, called no witnesses (she had wanted to call Cortez), and rested. (PageID.1283–1284.) Then the prosecution and Tara's counsel each gave closing arguments. (PageID.1285–1308.) That all occurred on the same day that Cortez made his final decision to not testify.

The next morning, Tara's counsel addressed the court: "Your Honor, this morning Tara Sullivan, my client, informed that because of the events which occurred yesterday morning and afternoon regarding her son, Cortez, and his decision not to testify that she wishes to give testimony in this case. She did not formally waive on the record for whatever value that has. The Court[,] I believe[,] has the authority to re-open a case at any point short of a verdict and I'm moving the Court to do so." (PageID.1403.) The motion was denied. Tara never did testify.

Tara says that the trial court deprived her of her constitutional right to testify on her own behalf. She points out that her decision not to testify had been premised on Cortez testifying. (ECF No. 12, PageID.1954.) After Cortez decided he would not testify—which, Tara stresses, was because the prosecutor had threatened to charge Cortez—she asked the court to testify the very next morning. At that point, the jury had not started its deliberations. Thus, in Tara's view, she was denied her constitutional right to testify. (ECF No. 12, PageID.1956.)

The Michigan Court of Appeals was not persuaded. It reasoned, "By foregoing the opportunity to testify before the close of proofs, Tara waived her constitutional right to testify on her own behalf. It was not necessary that Tara waive her right to testify on the record." *Sullivan*, 2014 WL 5462663, at *4 (internal citation omitted). The state appellate court also explained, "In this case, the request to reopen proofs was tardy. It was not made until after closing arguments had concluded. . . . Although counsel asserted that Tara now wanted to testify because Cortez had

18

declined to testify, Tara was aware at the time she exercised her right not to testify that Cortez had declined to testify." *Id.* at *5. The Michigan Court of Appeals thus concluded that "the trial court did not abuse its discretion in denying Tara's belated motion to reopen proofs." *Id.*

That "on the merits" adjudication means that Tara must clear § 2254(d) to obtain a writ of habeas corpus based on the denial of her right to testify.

She cannot clear that bar. Tara cites no case, let alone Supreme Court authority, indicating that she needed to expressly state that she was waiving her right to testify. Nor does she cite any case holding that counsel's decision to rest the defense case does not amount to a waiver of the defendant's right to testify.

And the cases Tara does cite do not support her right-to-testify theory. While the Court in *Rock v. Arkansas*, 483 U.S. 44 (1987), discussed the constitutional right to testify at length, *id.* at 49–53, in the end, the Supreme Court merely held that a state's categorical bar on "posthypnosis testimony" violated that right, *id.* at 62. Tara also cites *Crane v. Kentucky*, 476 U.S. 683 (1986); but there, the Court held only that the defendant's right to be heard included the right to testify "about the environment in which the police secured his confession," *id.* at 691. *Poindexter v. Booker*, 301 F. App'x 522 (6th Cir. 2008), is also of no help to Tara; in that case, two of the defendant's witnesses appeared during the defendant's closing argument; the Sixth Circuit held that counsel's "failure to investigate the [two witnesses] before trial or attempt to reopen the proofs when they did appear at trial" was constitutionally deficient performance, *id.* at 531; thus, *Poindexter* did not address whether the defendant had waived his right to testify. *United States v. Serio*, 440 F.2d 827 (6th Cir. 1971), does not help Tara obtain a writ either; there, the defendants attempted to escape custody after the government had rested its case; the court permitted the

government to reopen its case to introduce the escape attempt, *id.* at 830; here, Cortez had decided not to testify before Tara rested.

Not only do Tara's cases fail to establish that she needed to expressly waive her right to testify, there is case law supporting the contrary rule. In *United States v. Webber*, the Sixth Circuit explained, "Barring any statements or actions from the defendant indicating disagreement with counsel or the desire to testify, the trial court is neither required to sua sponte address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor ensure that the defendant has waived the right on the record. . . . Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so." 208 F.3d 545, 551 (6th Cir. 2000).

In short, Tara has not shown that the Michigan Court of Appeals' finding that she "waived her constitutional right to testify" was contrary to, or involved an unreasonable application of, Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

That would be the end of the matter, except that Tara might also be arguing that even if she failed to testify during trial, the trial court should still have exercised its discretion and allowed her to testify pre-verdict. But assuming Tara makes that argument, and further assuming that it is premised on federal law, it would not entitle her to the writ. As the Michigan Court of Appeals noted, Tara's request to reopen proofs was after the prosecution and her counsel had given their closing arguments. (PageID.1285, 1292.) It arguably would not have been fair to allow Tara to craft her testimony in light of the closing arguments. So it was also not unreasonable for the Michigan Court of Appeals to find that "the trial court did not abuse its discretion in denying Tara's belated motion to reopen proofs." *Sullivan*, 2014 WL 5462663, at *5.

In short, Ground II of Tara's petition does not warrant a writ.

20

## E.

Tara also claims that she was denied a fair trial because the prosecution did not try to locate an eyewitness to the shooting. Recall, Williams was the off-duty police officer who witnessed parts of the shooting incident. Before Williams arrived at the scene of the shooting, he had driven past two people, one of whom he recognized. (PageID.838–839.) Williams stopped and learned that one of the two, the person who he did not know, needed a ride. (PageID.839–841.) So he offered one. (PageID.841.) Tara's counsel requested that the prosecution identify Williams' passenger and even filed a motion seeking to have her produced. (ECF No. 10, PageID.141–146; ECF No. 12, PageID.1958–1959.) But the passenger was never identified and was never called to testify.

Under Michigan law, a defendant has the right to seek help from the prosecution in locating and serving process on a witness, Mich. Comp. Laws § 767.40a(5); but this Court can only issue a writ for a violation of federal law. And Tara has not established that federal law required the prosecution to help locate or subpoena Williams' passenger. *See Brown v. Burton*, No. 18-2145, 2019 WL 4865392, at *2 (6th Cir. Apr. 9, 2019) ("While Brown has a constitutional right to call witnesses at trial in his defense, he does not cite any Supreme Court precedent that mandates that the prosecution must find missing witnesses for him."); *accord Moss v. Woods*, No. 16-2568, 2017 WL 5495716, at *2 (6th Cir. Apr. 5, 2017). And to the extent that Tara would rely on *Brady v. Maryland*, 373 U.S. 83 (1963), she has made no showing that the passenger's testimony would have been exculpatory.

Related to this claim, Tara argues that because the prosecution did not assist in locating the passenger in Williams' car, the trial court should have provided a missing-witness instruction (ECF No. 12, PageID.1960), i.e., an instruction "that the missing witness would have been unfavorable to the prosecution," *People v. Perez*, 670 N.W.2d 655, 658 (Mich. 2003). But, again, Tara has not

shown that federal law required this remedy. And to the extent that Tara would rely on the Due Process Clause, she has not established that her trial was fundamentally unfair because the jury was not instructed to presume that the passenger in Williams' car would have testified in Tara's favor. Indeed, because it is not known what the passenger would have said, the trial court arguably kept the trial fair by *not* providing that instruction.

Also related to this claim, Tara argues that because Cortez did not testify as a result of the prosecution's threat, a missing-witness instruction should have been given for Cortez. (ECF No. 12, PageID.1960.) But Cortez was not missing; he decided not to testify despite the prosecution's offer of use and transactional immunity. And Tara cites no case suggesting that the failure to provide a missing witness instruction—in any circumstance—violates the Due Process Clause.

Tara is not entitled to the writ based on Ground III.

## F.

In her petition for a writ of habeas corpus, Tara included a claim under *Alleyne v. United States*, 570 U.S. 99 (2013), and *People v. Lockridge*, 870 N.W.2d 502, 506 (Mich. 2015). (ECF No. 1, PageID.27 (Ground VI).) But that was because at the time she filed her petition, the trial court had not yet resentenced her following remand from the Michigan Supreme Court. She has since been resentenced, and she states that the "issue has been corrected." (ECF No. 12, PageID.1969.) So Ground VI is moot.

## IV.

For the reasons given, Tara Sullivan's petition for a writ of habeas corpus is DENIED.

The Court further finds that "reasonable jurists could debate," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), this Court's resolution of Ground I of Tara's petition, i.e., her claim that her constitutional rights were violated when the prosecution threatened to charge Cortez Sullivan and

Cortez subsequently elected not to testify. But reasonable jurists could not debate this Court's conclusion that Tara's other grounds do not warrant a writ. Accordingly, this Court GRANTS Tara a certificate of appealability on Ground I but DENIES her a certificate on all other claims. *See* 28 U.S.C. § 2253(c)(2).

If Tara chooses to appeal this Court's decision, she may proceed in forma pauperis. *See* 28 U.S.C. § 1915(a)(3).

SO ORDERED.

Dated: June 11, 2020

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 11, 2020.

s/Erica Karhoff
Case Manager to the
Honorable Laurie J. Michelson